**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:12-cv-61389**

WILHELMINA WARRICK; CIELITO
WARRICK; ADRIAN WARRICK;
AMANDA WARRICK; and BRANDON
WARRICK

                 Plaintiffs,

v.

CARNIVAL CORPORATION, a Florida
Foreign Corporation, a/k/a CARNIVAL
CRUISE LINES; CARNIVAL
CORPORATION & PLC; COSTA CRUISE
LINES, INC., a Florida Corporation; and
COSTA CROCIERE, S.P.A., a Foreign
Corporation,

                 Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiffs, WILHELMINA WARRICK, CIELITO WARRICK, ADRIAN WARRICK,

AMANDA WARRICK, and BRANDON WARRICK, (collectively referred to as "the

WARRICKS")by and through the undersigned counsel, hereby bring this action against the

Defendants, CARNIVAL CORPORATION ("CARNIVAL"); CARNIVAL CORPORATION &

PLC (CO.) ("CARNIVAL PLC."); COSTA CRUISE LINES, INC. ("COSTA CRUISE"); and

COSTA CROCIERE S.P.A. ("COSTA CROCIERE"), and allege as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction in this Court is appropriate. This is an action for  damages in excess of $75,000, exclusive of interest, costs, and attorney's fees.

2.      Jurisdiction in this Court is appropriate.

3.      Defendants are Florida corporations, engaged in business in the State of Florida, or maintain an office or agent in Florida.  See Fla. Sta. § 48.193.

4.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiffs are citizens of Massachusetts and Defendants are Florida corporate citizens, and more than $75,000, is in controversy.

5.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because some of Plaintiffs' claims arise under the Death on the High Seas Act codified at 46 U.S.C. § 30302.

6.      That jurisdiction is proper in this Court pursuant to 28 U.S.C. §1333, which provides original jurisdiction to the United States District Court exclusive if state courts of "any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they may be entitled."

7.      The Southern District of Florida is the proper venue for this action because:

   a.   Defendants conducted and continues to conduct substantial commercial activities there; and

   b.   The parties, CARNIVAL and COSTA CRUISE, agreed to litigate this dispute in the Southern District of Florida.

   c.   CARNIVAL has a forum selection clause that dictates the Miami-Dade Division of the Southern District, while COSTA CRUISE dictates that actions

be brought in the Broward Division of the Southern District. Therefore, either venue is proper.

8. Venue in this Court is appropriate in the United States District Court for the Southern District of Florida, in Broward County, Florida, pursuant to paragraph 2 of the Costa Cruise Ticket Contract. See Exhibit "A".

9. Finally, Plaintiffs elect to pursue all admiralty and maritime claims in this Court under the Savings-to-Suitors Clause. See 28 U.S.C. § 1333.

## PARTIES

10. At all times material, Plaintiff, WILHELMINA WARRICK, was a resident of Braintree, Massachusetts, United States, was booked as a passenger on the *Costa Concordia* for the sailing beginning on January 13, 2012, and is *sui juris.*

11. At all times material, Plaintiff, CIELITO WARRICK, was a resident of Braintree, Massachusetts, United States, was booked as a passenger on the *Costa Concordia* for the sailing beginning on January 13, 2012, and is *sui juris.*

12. At all times material, Plaintiff, AMANDA WARRICK, was a resident of Braintree, Massachusetts, United States, was a passenger on the *Costa Concordia* on January 13, 2012, and is *sui juris.*

13. At all times material, Plaintiff, ADRIAN WARRICK, was a resident of Braintree, Massachusetts, United States, was a passenger on the *Costa Concordia* on January 13, 2012, and is *sui juris.*

14. At all times material, Plaintiff, BRANDON WARRICK, was a resident of Braintree, Massachusetts, United States, was a passenger on the *Costa Concordia* on January 13, 2012, and is *sui juris.*

15.     Defendant, CARNIVAL CORPORATION ("CARNIVAL"), a/ka CARNIVAL CRUISE LINES, is a Panamanian corporation and is registered as a Florida foreign corporation with its principal place of business in Doral, (Miami) Florida.

16.     CARNIVAL CRUISE LINES is a trademarked brand name known to the public as "Carnival".

17.     CARNIVAL conducts substantial and not isolated business in Miami-Dade County, Florida.  See Exhibit "B" - Sunbiz Report.

18.     Defendant, CARNIVAL CORPORATION & PLC (CO.) ("CARNIVAL PLC"), is a dually listed company with headquarters and principal places of business in both Southhampton, England and Miami, Florida..

19.     CARNIVAL CORPORATION & PLC (CO.) ("CARNIVAL PLC") are separate legal entities however they jointly own and operate several cruise lines which include: Carnival Cruise Lines (23 ships); Princess Cruises (17 ships); Holland America Line (15 ships); COSTA CRUISE (15 ships); P&O Cruises (7 ships); Cunard (3 ships); Seabourn (5 ships); AIDA (8 ships); P&O Cruises Australia (3 ships); Iberocruceros (4 ships); and Holland America Princess Alaska Tours (Tour Operation).

20.     In 2010, CARNIVAL companies reported 2010 revenues of nearly $15 billion, of which it is believed more than half comes from American passengers.

21.     The cruise industry has grown substantially in the Unites States, with CARNIVAL leading the pack.

22.     CARNIVAL operates from several US ports, but has, for more than a decade, included Miami-Dade County as the venue of choice on all of its passenger tickets.

23.     As of the date Plaintiffs traveled on the *Costa Concordia*, CARNIVAL elected to insist that the Southern District of Florida is the jurisdiction to which ALL CARNIVAL passengers must consent as a condition of passage.

24.     Defendant, COSTA CRUISE LINES, INC., ("COSTA CRUISE") is a Florida corporation with its principal place of business in Hollywood, Florida.

25.     Upon information and belief, COSTA CRUISE LINES is a wholly owned subsidiary of CARNIVAL PLC.  See Composite Exhibit "C" - Carnival Corporation & PLC Press Release dated January 14, 2012.

26.     Defendant, COSTA CROCIERE, S.P.A. ("COSTA CROCIERE"), is an Italian corporation and, upon information and belief, is a wholly owned subsidiary of Carnival. COSTA CROCIERE has applied for and received a certificate of authority from the Florida Department of State to transact business in this state.

27.     In addition to the heavy marketing and sales done from the Unites States, COSTA CROCIERE engages in business and maintains an office in Florida.

28.      Additionally, COSTA CROCIERE has a registered agent in Florida.

## **INTRODUCTION**

29.     CARNIVAL is the largest and financially strongest cruise company and amongst the largest and most profitable vacation companies in the world.

30.     The CARNIVAL brand includes several cruise lines, including but not limited to Defendant, COSTA CRUISE.

31.     The various cruises lines within the CARNIVAL brand and fleet call on 250 ports worldwide.

32.     CARNIVAL directly and/or indirectly through its agents or others undertakes to train and supervise the crew, including officers, in ship maneuvering, bridge resource management, ship stability, emergency preparedness and other maritime skills for all of its cruise brands, including COSTA CRUISE, recognizing that the same is essential to the safety of passengers.

33.     At all times material, Defendants, CARNIVAL PLC and CARNIVAL, exercise such a degree of control over Defendant, COSTA CRUISE, that the acts of COSTA CRUISE are in fact the acts of CARNIVAL PLC and CARNIVAL.

34.     At all times material, COSTA CRUISE and COSTA CROCIERE act as agents for CARNIVAL PLC and CARNIVAL and manifest no separate corporate interests of their own, functioning solely to achieve the purposes of CARNIVAL PLC and CARNIVAL.

35.     At all times material, COSTA CRUISE was and is the alter-ego of CARNIVAL and CARNIVAL PLC.

36.     Additionally, COSTA CRUISE is a subsidiary of its parent corporation, CARNIVAL.

37.     As further evidence of their relationship and agency, CARNIVAL and COSTA CRUISE share interlocking Board of Directors, for example Pier Luigi Foschi is a Director of CARNIVAL PLC and Chairman of COSTA CRUISE.  See Exhibit "D" - CARNIVAL PLC: Pier Luigi Foschi To Retire as CEO of Costa Group, *Bloomberg News*, Bloomberg.com, April 23, 2012.

38.     At all times material, Defendants share the same maritime policy and compliance officer.  See Exhibit "D" - CARNIVAL PLC Press Release, January 19, 2012:

> Carnival Corporation & plc and the cruise industry as a whole have maintained an excellent safety record over the years. "However,

this tragedy has called into question our company's safety and emergency response procedures and practices," said Micky Arison, chairman and CEO of Carnival Corporation & plc. "While I have every confidence in the safety of our vessels and the professionalism of our crews, this review will evaluate all practices and procedures to make sure that this kind of accident doesn't happen again."

The review is being led by Captain James Hunn, a retired U.S. Navy Captain and currently the company's senior vice president of Maritime Policy & Compliance. Following a 32-year career in the Navy, Hunn has held senior positions at Carnival Corporation & plc for nearly a decade, focusing on corporate-wide efforts to establish maritime policy standards, while overseeing the company's health, environmental, safety, and security practices.

39.     Upon information and belief, Defendants, CARNIVAL PLC and CARNIVAL, are responsible for training and hiring of staff across the various cruise brands that operate under the CARNIVAL empire.

40.     To illustrate the above, CARNIVAL PLC owns another corporation, CSMART, which is a state of the art training facility which trains COSTA CRUISE employees, as stated on its website www.csmartalmere.com.  See Composite Exhibit "E".

## FACTUAL ALLEGATIONS AS TO EACH COUNT

41.     Upon information and belief, the *Costa Concordia* ship is owned and operated by one or more of the Defendants directly and/or through one of their subsidiaries or agents.

42.     Upon information and belief, the *Costa Concordia* departed out of Port Civitavechia, Italy in the Tyrrhenia Sea, carrying approximately 4,200 passengers and heading north to Savona, Italy, on January 13, 2012 at approximately 7 PM local time.

43.     Upon information and belief, the *Costa Concordia* was to embark on its regular itinerary schedule that included stops in ports at Savona, Italy; Marseille, France; Barcelona, Spain; Palma De Mallorca, Cagliari, and Palermo, Italy.

44.     Upon information and belief, not all passengers on the *Costa Concordia* boarded the ship in Civitavechia, Italy, including two of the WARRICK Plaintiffs who were denied passage after having purchased their tickets.

45.     Upon information and belief, Plaintiffs entered into a travel agreement with COSTA CROCIERE for the purchase of a tourism package including a cruise named "Mediterranean Treasures" onboard the M/V *Costa Concordia*.

46.     Upon information and belief, some passengers had previously boarded the *Costa Concordia* in Barcelona on January 9, 2012, four (4) days earlier.

47.     Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK, were denied boarding the *Costa Concordia* despite COSTA CRUISE approving their purchase for travel.

48.     Plaintiffs purchased their *Costa Concordia* cruise tickets directly from COSTA CRUISE.

49.     Upon information and belief, at the time Plaintiffs were booking their travel, passengers who purchase their tickets online must assent to a particular *Terms and Conditions*. In order to view the text of the *Terms and Conditions*, purchasers must click on an expansion button next to the title of each of the thirteen paragraphs to reveal its otherwise-hidden contents.

50.     Upon information and belief, at the time WARRICK Plaintiffs booked their cruise, the *Terms and Conditions* that were made available for them to review were NOT the same as the *Terms and Conditions* they were asked to sign when boarding the *Costa Concordia.*

51.     Those specific *Terms and Conditions* were not available for Plaintiffs to review prior to booking their travel, so, accordingly,.  Plaintiffs had to "agree" to the *Terms and Conditions* before they were provided with them.  Clearly, no meeting of the minds occurred.

52.     On January 13, 2012 at approximately 9:44 PM, the *Costa Concordia* hit the Le Scole Reef when Captain Francesco Schettino steered the ship too close.

53.     The ship scrapped the reef resulting in a 150-160 foot-long hole in the hull on the port side of the ship.

54.     As a result, the ship began to take in water and began to sink.

55.     Upon information and belief, Captain Schettino was distracted and talking on his cellular telephone while steering the ship. See Exhibit F - Captain of shipwrecked Costa Concordia says he was 'distracted.' Fox News.com, July 11, 2012.

56.     Passengers described feeling the ship shake, similar to an earthquake.  Passengers described hearing a loud rumbling noise, and then feeling the ship listing violently to the port side.  No alarm sounded.

57.     Shortly thereafter, the power on the ship went out and an announcement was made over the loudspeakers that there was an electrical blackout and that technicians were working on the problem.

58.     Upon information and belief, many passengers went to line up to get aboard the life boats and the ship crew refused to allow access and ordered passengers to go back to their cabin while others climbed into life boats and were ordered out and told to go back to their cabins.

59.     Fifteen (15) minutes after the collision the captain called the ship's owners, the Defendants, to advise them of the situation.

60.     The Italian Coast Guard was not called by either the captain or the ship's owners, and no "*SOS*" was ever issued.

61.     Upon information and belief, at the time the passengers were being told to return to their cabins the captain and the ship's owners were aware that the ship was sinking and the captain was trying to use the docking thrusters to beach the ship.

62.     According to news reports and interviews of travelers, the Italian Coast Guard received numerous phone calls from *Costa Concordia* passengers and emergency operators which prompted it to make contact with the ship.

63.     With the assistance of crew members many passengers were able to assemble near the life boats but were not given orders to get in the life boats, forced instead to wait as the *Costa Concordia* continued to list heavily to its starboard side.

64.     At approximately 10:26 PM Captain Schettino, responding to an Italian Coast Guard official, admitted damage to the ship but claimed a tugboat was all that was needed.

65.     Continuing to head north, the *Costa Concordia* was steered to Giglio Island and next hit the reef at Gabbinara point. The front of the ship swung around and became pinned by the rocks at approximately 10:50 PM.

66.     Captain Schettino gave the order to abandon ship at approximately 11 PM, and abandoned ship himself shortly thereafter and prior to evacuation of all passengers.

67.     At this time, COSTA had not devised a plan of action, so passengers were left to fend for themselves.

68.     Since a large portion of the crew did not speak Italian, French, German, Spanish, or even English,  passengers struggled to communicate with crew members.

69.     Further, with no policy in place that gave insight as to handle the matter, emergency protocols were not communicated or initiated.

70.     When attempts to access emergency equipment were made, a large portion of crew members did not know how to operate safety and evacuation equipment.

71.     It has been reported that there were not enough life vests and many of the night lights in the life vests were not working or were inadequate flotation devices.

72.     Because the captain was unreachable, and the chain of command would normally call for the captain to give an order of evacuation, the evacuation order took much longer to be given than it should have.

73.     Many of the life boats on one side of the ship were underwater and/or unreachable by the time the order to evacuate was given. Consequently, there were not enough life boats and many passengers, including passengers who did not know how to swim were forced to climb down the ship into the water.

74.     Upon information and belief, crew members improperly boarded and operated the life boats; and in one such incident a crew member was lowering a life boat carrying 70 people too quickly and it crashed into the vessel.

75.     A review of live video of the incident shows hundreds of passengers jumping from the ship.  Passengers were forced to dive into the cold winter-time sea.

76.     The temperature was in the 40s Fahrenheit and the water temperature approximately 55°.  In these conditions death can occur from hypothermia in as little as one hour.

77.     Passengers who swam or were dragged to shore arrived at the shore to find the captain, his companion, and many senior officers on shore, dry, with their luggage.

78.     Upon information and belief, at 12:42 AM, while passengers were still swimming to shore the Coast Guard commander contacted the captain.

79. The captain was ordered to return to the ship and to climb aboard to inform the Coast Guard how many people were still on board. Despite being told that there were women and children still stranded, the captain never returned to the ship.

80. Upon information and belief, no crew member came to the aid of passengers once they reached shore. No directions or instruction were given and no help was offered, no blankets were distributed, no food or water was distributed.

81. The *Costa Concordia* crew did not adequately come to the aid of the shipwrecked passengers, nor did they follow a policy and procedure that would have mitigated the damage and injury borne by *Costa Concordia* passengers.

## COUNT I - BREACH OF CONTRACT

Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK, adopt and re-allege all allegations contained in paragraphs 1 to 79 as fully stated herein and further allege:

80. Plaintiffs entered into a valid contract when they purchased their cruise tickets.

81. As part of their reservation, passengers, including WILHELMINA WARRICK and CIELITO WARRICK, were asked to supply their citizenship and passport details.

82. Within minutes of purchasing their tickets, Plaintiffs received confirmation of their purchase via electronic mail.

83. Plaintiffs relied upon this confirmation and flew from the United States to Barcelona, Spain at great expense to enjoy the cruise vacation that they had purchased.

84. Despite that they held valid tickets, Defendant, COSTA CRUISE, denied them passage on the vessel in Barcelona, Spain.

85.    Defendants, and/or their agents, servants, and/or employees have breached the material terms of the Cruise Ticket Contract when they refused to allow Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK, to board the vessel in Barcelona.

86.    As a direct and proximate result of Defendant's breach, Plaintiffs have suffered monetary damages as well as severe mental anguish.

87.    Further, as a direct and proximate result of Defendant's breach, all Plaintiffs severed mental anguish.

<u>**COUNT II- UNJUST ENRICHMENT**</u>

Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK, adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

87.    Plaintiffs conferred a monetary benefit on the Defendants and/or their agents, servants, and/or employees when they purchased their travel tickets, in consideration for participating in the cruise on the *Costa Concordia* for sailing on or about January 13, 2012.

88.    Defendants, and/or their agents, servants, and/or employees, were aware of the monetary benefit conferred upon them by the Plaintiffs when Plaintiffs purchased their cruise tickets.

89.    Defendants voluntarily accepted and retained Plaintiffs' money, despite denying WILHELMINA WARRICK and CIELITO WARRICK the right to board onto the vessel and participate in the cruise that they had purchased as a family..

90.    The circumstances render Defendants' acceptance of the benefit conferred upon them as inequitable unless Defendants provide to Plaintiffs the value of the benefit.

91.     Defendants' failure to abide by the *Terms and Conditions* of the Cruise Ticket for the value of the benefit received has caused Defendants to be unjustly enriched by Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK.

92.     As a direct result of the Defendants actions, Plaintiffs, WILHELMINA WARRICK and CIELITO WARRICK, have suffered damages including the costs of litigating this action.

## COUNT III(A) - FRAUDULENT MISREPRESENTATION

Plaintiffs, WILHELMINA WARRICK, CIELITO WARRICK, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all  allegations contained in paragraphs above as fully stated herein and further allege:

93.     Defendants made a false statement concerning material facts, to wit: that the Costa Cruise Line strictly complies with all safety regulations regarding passenger safety and security.

94.     The false statements was made with the intent to deceive passengers into purchasing tickets.

95.     Defendants knew or should have known the statement was false, that Captain Schettino made sail-by-salutes and sailed too close to shore, and that the crew was not properly trained on safety and security procedures, and that passengers could be on the ship for days before a safety drill was executed.

96.     Plaintiffs were induced to purchase tickets for the *Costa Concordia* cruise and justifiably relied on Defendants statements to provide for their safety and security while on the ship.

97.     By failing to reasonably communicate the terms of the agreement that the WARRICKS were purported to have assented to online in order to book their vacation with Defendant Cruise Lines ("the purported agreement"),  Defendant Cruise Lines knowingly misrepresented material facts concerning the WARRICKS' travel aboard the *Costa Concordia* and purchase of fare for the same.

98.     By communicating the terms of the purported agreement in a way that undermined the WARRICKS' ability to become familiar with its terms, Defendant Cruise Lines knowingly misrepresented material facts concerning the WARRICKS' travel aboard the *Costa Concordia* and purchase of fare for the same.

99.     By communicating the terms of the purported agreement in a way that denied Plaintiffs an opportunity to examine its contents, Defendants knowingly misrepresented material facts concerning the WARRICKS' travel aboard the *Costa Concordia* and purchase of fare for the same.

100.    By presenting Plaintiffs at the point of embarkation on *Costa Concordia* with terms which were new and different terms from to those purportedly offered to them when they booked their vacation online, terms which they could not reject with impunity, Defendants knowingly misrepresented material facts concerning the WARRICKs' travel aboard the *Costa Concordia*.

101.    Defendants made the above misrepresentations to Plaintiffs in order to sell them passage on the *Costa Condordia*.

102.    Defendants made the above misrepresentations to Plaintiffs in order to discourage them from subsequently pursuing legitimate claims.

103.    Specifically Defendants made these misrepresentations to gain agreement to a variety of terms attempting to limit or eliminate the Defendants' customary responsibilities to, and liabilities for, the WARRICKS' injuries, including but not limited to a forum selection clause, a limitation on the time for instituting an action for damages and a limitation on the availability of class actions.

104.    Plaintiffs were consequently injured by the Defendants' gross negligence while acting in reliance on Defendants' assurance that they would be safe and secure on the ship.

### COUNT III (B) - VICARIOUS LIABILITY FOR  FRAUDULENT MISREPRESENTATION

Plaintiffs, WILHELMINA WARRICK, CIELITO WARRICK, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all  allegations contained in paragraphs above as fully stated herein and further allege:

105.    Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

### COUNT IV(A) - MARITIME NEGLIGENCE

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK and ADRIAN WARRICK, adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

106.    At all times material, Defendants owned, operated, managed, maintained and/or controlled the vessel, *Costa Concordia.*

107.    At all times material, Defendants had exclusive custody and control of the vessel and its crew.

108.    At all times material, Defendants had a duty to understand the navigational charts for the planned course the vessel would take, and to have knowledge of any potential reefs, nature preserves, sand bars or other potential undersea hazards that may be within close vicinity of the planned course.

109.    At all times material, Defendants had a duty to know of any potential undersea hazards surrounding a land mass the vessel may sail past, including knowing how close is a safe distance to pass.

110.    At all times material hereto, Defendants had a duty to comply with all United States and International regulations and procedures regarding the health, safety & security of all passengers on the *Costa Concordia.*

111.    At all times material hereto, Defendants had a duty to exercise safety and security and evacuation procedures in a timely manner. Upon information and belief, according to United States standards, from the moment the captain gave the signal to abandon ship, the crew should have loaded and launched the lifeboats within 30 minutes.

112.    At all times material hereto, Defendants had a duty to train the *Costa Concordia* captain and senior officers to remain on the ship until all of the passengers were safely evacuated.

113.    At all times material hereto, Defendants knew, or should have known, that the hull of the *Costa Concordia* could not withstand a scrape against a reef.

114.    At all times material hereto, Defendants knew, or should have known, that the *Costa Concordia* did not have a sufficient safety system that would sound an alarm that would alert crew and passengers of an emergency situation, such as a 150-165 foot gash in the hull of the vessel and that it was taking on water.

17

115.    The *International Convention for the Safety of Life at Sea* adopted after the Titanic sank, states that there should have been an emergency drill within 24 hours of the start of the ship's voyage.   At all times material, Defendants knew, or should have known that the Defendants had not conducted a safety drill since departing Barcelona on January 9, 2012.

116.    At all times material hereto, Defendants knew or should have known that they had not trained a large portion of crew members on safety and evacuation procedures, or to use safety and evacuation equipment.

117.    At all times material hereto, the Defendants knew or should have known that a large portion of the crew did not speak Italian, French, German, Spanish, or English to a degree where they could communicate with the passengers or other crew members.

118.    At all times material hereto, Defendants knew or should have known the risks of sailing a ten-story cruise ship close to a coastal reef.

119.    Moreover, Defendants knew or should have known that *Costa Concordia* had sailed close to the shoreline on previous occasions, a practice known as a 'sail-by-salute'.  COSTA CROCIERE has acknowledged previously giving Schettino permission to skirt the coast of Giglio.

120.    Defendants knew or should have known that the Captain of the *Costa Concordia* did do sail-by-salutes. Captain Schettino reportedly told prosecutors: "It was planned, we were supposed to have done it a week earlier but it was not possible because of bad weather. They insisted. They said: 'We do tourist navigation, we have to be seen, get publicity and greet the island.'"

121.    It was the duty of the Defendants to provide Plaintiffs with comfortable accommodations and to exercise reasonable care and effort to avoid subjecting the passengers to

suffering or inconvenience.  <u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332, 1334 (11th Cir. 1984).

122.    The Defendants breached that duty when Captain Schettino failed to maintain control of the vessel and sailed the *Costa Concordia* too close to the Le Scole Reef, scraping the vessel against the reef, causing a massive hole in the port side.

123.    The massive hole in the side of the ship created an emergency situation and a reasonable duty of care would have been for the Captain and crew to immediately follow safety and evacuation procedures.

124.    Plaintiffs found themselves in a listing, capsizing, sinking vessel without communication, direction, or help from the Captain and misdirection from the crew from approximately 9:45 PM to approximately 11 :00 PM, and were left to fend for themselves.

125.    Plaintiffs,    BRANDON WARRICK, AMANDA WARRICK and ADRIAN WARRICK, allege that the Defendants' acts and omissions were caused by the joint negligence and fault of Defendants and/or their agents, servants, and/or employees which includes, without limitation, the following:

(a) Defendants failed to properly inspect and conduct safety training and drills on the *Costa Concordia* to assure that its equipment was working and crew were properly trained on all safety and evacuation procedures;

(b) Defendants failed to promulgate, implement, and enforce procedures pertaining to the safe operation of the *Costa Concordia* which, if they had been so promulgated, implemented and enforced, would have averted the grounding and sinking;

(c) Defendants failed to properly operate the *Costa Concordia* and acted in a careless, reckless, and negligent manner without due regard for the safety of others when the captain steered the vessel too close to the coast;

(d) Defendants failed to take appropriate action to avoid scraping Le Scole Reef;

(e) Defendants failed to act, failed to alert passengers, and failed to timely implement proper evacuation procedures after the ship scraped the Le Scole Reef and began to list to the port side;

(f) The Captain failed to ascertain the true nature of the ship's condition and precipitously and improperly directed the ship to be grounded. Such actions without proper or reasonable foundation led to a dangerous condition thereby complicating the evacuation procedures.

(g) Defendants failed to warn passengers that it had scraped the Le Scole Reef causing a 150-165 foot hole on the port side of the ship, and that it was taking on water;

(h) When the Captain finally gave the order to abandon ship, the Defendants failed to implement policies and procedures to safely conduct a evacuation of the ship;

(i) Defendant failed to release lifeboats in timely manner before ship began to list and thereby made it impossible to release lifeboats;

(j) Defendants negligently purchased and utilized  a vessel that could not release its lifeboat if the vessel began to list a common occurrence in sinking vessels.

(k) Defendant negligently purchased and utilized a vessel that was not properly designed to compartmentalized breaches to the hull and thereby remain afloat even after a significant breach.

(l) Defendants' Captain and crew negligently evacuated the ship before all passengers had left the vessel a breach of long standing maritime tradition and law, and did not return to the vessel even after being ordered by the Italian Coastguard, which further endangered passengers who remained on board while the ship sank.

(m) Defendants engaged in such other acts of negligence and omissions as will be shown at the trial of this matter.

126.   As a direct and proximate result of Defendants' negligence, Plaintiffs, BRANDON WARRICK, AMANDA WARRICK and ADRIAN WARRICK, were stranded at sea in a sinking ship without communication or direction from the Captain or crew, and had to fend for themselves.

127.   The Defendants' negligence directly contributed to the deaths of approximately 32 people and the ensuing terror for those who survived.

128.   Plaintiffs were in terror of catastrophic injury, death, drowning, having been placed in a situation where common sense said the vessel was sinking but the orders from the crew were to return to their cabins.

129.   As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and will continue to suffer severe discomfort, injuries and sickness, severe mental anguish, pain, loss of enjoyment of life, aggravation of any previously existing conditions, lost wages, loss of wage earning capacity.

130.   As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered property damages including, but not limited to, loss of the cost of the cruise ticket, clothes, luggage, computers, cash, jewelry, technology items such as cell phones and ipods,

glasses, contact lenses, medications, proof of identity such as passports, driver's licenses, green cards, in an amount to be determined by the trier of fact.

131.     Furthermore, the disaster would not have occurred had the Defendants exercised the degree of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur.*

## COUNT IV(B) - VICARIOUS LIABILITY FOR MARITIME NEGLIGENCE

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

132.     Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

## COUNT V(A) - GROSS NEGLIGENCE

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK and ADRIAN WARRICK, adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

133.     At all times material, Defendants owned, operated and or maintained the *Costa Concordia.*

134.     At all times material, Defendants had a duty to Plaintiffs to maintain and operate the *Costa Concordia* so as to not create hazardous and life threatening conditions.

135.     At all times, Defendants breached that duty by creating hazardous and life threatening conditions.

136.    At all times material, Defendants had a duty to Plaintiffs to respond to the life threatening situation, the situation Defendants created, and to respond according to proper procedures and regulations, in a quick and expedited manner to ensure the safety and well-being of the passengers, and to minimize injury.

137.    Defendants acted in a severely reckless and willful, wanton, manner, with complete disregard for the safety, lives and well-being of the Plaintiffs, demonstrating an extreme departure from reasonable care coupled with a conscious awareness of the risk of harm, and thus breached their duties to the Plaintiffs in every regard by:

(a) choosing not to conduct a safety drill since at least January 9, 2012, when the ship left port in Barcelona, Spain.

(b) choosing not to investigate the noise created by the scraping on the Le Scole Reef and the immediate subsequent listing of the vessel;

(c) choosing not to alert the crew to investigate the noise or the reason for the listing of the vessel;

(d) failure to properly train crew to respond to act to save lives in the absence of action or direction from the Captain when it was obvious the ship was listing and sinking;

(e) failure to properly train crew to use emergency equipment and life boats;

(f) failure to properly train crew to complete an emergency task once it has begun;

(g) failure to WARN the passengers;

(h) failure to ascertain the true nature of the ship's condition and precipitously and improperly directed the ship to be grounded. Such actions without proper or reasonable foundation led to a dangerous condition thereby complicating the evacuation procedures;

(i) failure to take action to officially prepare for an evacuation until approximately 11 P.M., one hour and 15 minutes after the vessel scraped the Le Scole Reef, leaving a 150-165 foot gash in the port side of the hull;

(j) abandoning the ship before all the passengers were evacuated and accounted for;

(k) failure to take an accounting of and assist passengers in any way once they reached shore on Giglio Island;

138.     As a result of Defendants' gross negligence, Plaintiffs were stranded at sea in a sinking ship without communication or direction from the Captain or crew, and had to fend for themselves.

139.     Defendants gross negligence directly contributed to the deaths of thrirty-two (32) travelers and the ensuing terror for those who survived.

140.     Plaintiffs were in terror of catastrophic injury, death, drowning, having been placed in a situation where common sense said the vessel was sinking but the orders from the crew were to return to their cabins.

141.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and will continue to suffer severe discomfort, injuries and sickness, severe mental anguish, pain, loss of enjoyment of life, aggravation of any previously existing conditions, lost wages, loss of wage earning capacity.

142.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered property damages including, but not limited to, loss of the cost of the cruise ticket, clothes, luggage, computers, cash, jewelry, technology items such as cell phones and Ipods, glasses, contact lenses, medications, proof of identity such as passports, driver's licenses, green cards, in an amount to be determined by the trier of fact.

## COUNT V(B) - VICARIOUS LIABILITY FOR GROSS NEGLIGENCE

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

143.   Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

## COUNT VI(A) - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

144.   Defendants  acted with intent and/or recklessness in carrying out the actions as described above.

145.   Defendants conduct was so outrageous as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community.

146.   Defendants' conduct, as a direct and proximate result, caused Plaintiffs severE emotional distress in the form of prolonged and repeated instances of fear, terror, mental anguish and distress from anticipation of imminent injury or death.

147.   Defendants' gross negligence in operating the ship, failure to warn passengers of the Defendant-created emergency situation, Defendants'  failure to act, and the Captain's abandonment of ship, was intentional and reckless conduct.

148.   Further, the crew members abandoning the *Costa Concordia* while there was an emergency evacuation caused additional emotional distress and fear of peril.

149.     COSTA CRUISE's crewmembers actions and inactions, for which Defendants are vicarious liable, were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

150.     As a direct and proximate result of the Defendants' conduct, Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK, have suffered severe emotional distress.

## COUNT VI(B) - VICARIOUS LIABILITY OF CONDUCT RELATED TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

151.     Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

## COUNT VII(A) - NEGLIGENT HIRING, SUPERVISION AND RETENTION

152.     Plaintiffs, BRANDON WARRICK, AMANDA WARRICK and ADRIAN WARRICK, adopt and re-allege all  allegations contained in paragraphs above as fully stated herein and further allege:

153.     Defendants, directly and/or by and through their agents, were the employers of *Costa Concordia's* crew, including her Captain, and/or had the authority to direct the employment of *Costa Concordia's* crew, including her Captain.

154.     Defendants had the ability to control *Costa Concordia's* crew, including her captain such as to substantially reduce the probability of harm to other persons.

155.    Captain Francesco Schettino had a practice of doing a 'sail-by-salute' as he steered a vessel close to a shoreline.

156.    That Schettino would have maneuvered the *Costa Concordia* in such a reckless manner again, was either known to Defendants or could reasonably have been anticipated by them and could have been prevented by Defendants' exercise of due diligence and authority over *Costa Concordia's* Captain. Defendants failed to do so.

157.    Defendants were aware of this propensity and ratified that practice despite the fact that it could cause a vessel to sail too close to shore.

158.    Defendants became aware, or should have become aware, of problems with Captain Francesco Schettino that indicated his unfitness.

159.    Defendants became aware, or should have become aware, of problems with the crew of the Costa Concordia that indicated their unfitness.

160.    Defendants failed to conduct an adequate inquiry into Schettino 's background that would have indicated his unfitness.

161.    Defendants failed to conduct an adequate inquiry into background of the crew members that would have indicated his unfitness.

162.    Upon information and belief, Defendants had notice around 10:05 PM on the night of the shipwreck, that *Costa Concordia* had a gash in her hull and would sink, but that the Captain, recklessly, had not ordered the ship abandoned or informed the Italian coast guard which in all probability would greatly harm all aboard.

163.    Schettino's reckless failure to act as *Costa Concordia* sank could reasonably have been anticipated by Defendants and could have been prevented by Defendants' exercise of due diligence and authority over *Costa Concordia* Captain that night.  Defendants failed to do so.

164.    Defendants failed to monitor and/or direct the Captain and his crew during the course of the incident.

165.    As a direct and proximate result of Defendants' failures, Plaintiffs suffered personal injury, pain and suffering, and economic and non-economic injury.

166.    At all times material hereto, Defendants owned, operated, managed, maintained and/or controlled the vessel, *Costa Concordia.*

167.    At all times material hereto, Defendants had exclusive custody and control of the vessel and its crew.

168.    At all times material hereto, Defendants had a duty to hire, train and supervise only the most qualified of crew members, including but not limited to the captain.

169.    At all materials times the risk of navigating a passenger vessel is serious and requires specialized training and supervision, as well as the most rigorous of policies and procedures to maintain the specialized skills of a captain.

170.    At all material times, the training would have required understanding of the potential reefs, sand bars and/or or other potential undersea hazards that may be within close vicinity of the planned course.

171.    At all times material hereto, Defendants had a duty to know of any potential dangers.

172.    At all times material hereto, Defendants had a duty to comply with all United States and International regulations and procedures which are meant to protect cruise ship passengers.

173.    At all times material hereto, Defendants had a duty to create policies and procedures for evacuation.

174.    At all material times, Defendants had a duty to create and train its crew on safe evacuation procedures.

175.    At all times material hereto, Defendants had a duty to train the *Costa Concordia* captain and senior officers to remain on the ship until all of the passengers were safely evacuated.

176.    At all times material hereto, Defendants knew, or should have known, that the hull of the *Costa Concordia* could not withstand a scrape against a reef.

177.    At all times material hereto, Defendants knew or should have known, that the *Costa Concordia* was not equipped with adequate safety equipment.

178.    At all materials times, the safety equipment onboard the *Costa Concordia* was not one that would automatically sound an alarm which, if installed and properly working, would have alerted crew and passengers in the event of an emergency situation.

179.    A 150-165 foot gash in the hull of the vessel which was quickly causing the ship to sink is clearly an "emergency situation".

180.    The *International Convention for the Safety of Life at Sea* mandates that every vessel have an emergency drill within 24 hours of the start of the ship's voyage.

181.    Upon information and belief, Defendants had not conducted a safety drill since departing Barcelona on January 9, 2012.

182.    At all times material hereto, Defendants knew or should have known that they had not trained a large portion of crew members on safety and evacuation procedures, or to use safety and evacuation equipment.

183.   At all times material hereto,  Defendants knew or should have known that a large portion of the crew did not speak a universal language and therefore would have difficulty communicating with passengers and/or other crew members.

184.   COSTA acknowledged giving Schettino permission on previous instances to skirt the coast of Giglio, a dangerous practice also known as a "sail-by-salute".

185.   Sail-by-salute is, in itself, a dangerous and negligent act when carrying a ship with travelers.

186.   Defendants failed to make a proper investigation and/or inspection of its employees, actual agents, apparent agents or borrowed servants.

187.   An appropriate investigation would have revealed that the employees, actual agents, apparent agents or borrowed servants were not suited to act as captain.

188.   It was unreasonable for Defendants to hire and/or employ its employees, actual agents, apparent agents or borrowed servants an light of the information they knew or should have known.

189.   Specifically, Defendants, did the following:

a.   failed to perform an adequate background check on the qualifications of its crew;

b.   was negligent in the selection of its crew members, specifically the captain;

c.   was negligent in the training of its crew members;

d.   was negligent in the supervision of its crew members, including but not limited to the captain;

e.   was negligent in the retention of its crew members, particularly the captain; and

f.   was negligent in its development and implementation of an evacuation policy.

190.    That is a direct and proximate result of the carelessness and negligence of Defendants, as aforesaid, that Plaintiffs have incurred medical and hospital expenses, expect for bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of the capacity for the enjoyment of life, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition.  These losses are permanent and continuing in nature and the plaintiff will suffer will losses in the future.

### COUNT VII(B) - VICARIOUS LIABILITY OF CONDUCT RELATED NEGLIGENT HIRING, SUPERVISION AND RETENTION

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

191.    Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

### COUNT VIII- ACTUAL AGENCY

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

192.    As described above, Defendants, CARNIVAL, allowed other Defendants, including but limited to COSTA CRUISE, to utilize the company name in such a way that prospective travelers and passengers would reasonably understand that COSTA CRUISE was acting in conjunction with the CARNIVAL brand.

193.    Further, CARNIVAL made or allowed statements to be made or published to the general public that made it reasonable for the public and plaintiffs, in particular, to believe that

CARNIVAL and COSTA CRUISE are one corporate empire, with CARNIVAL as the parent corporation to its subsidiary, COSTA CRUISE.

194.   Additionally, CARNIVAL, through its subsidiary, CSmart, hired and trained the COSTA CRUISE crew members.

195.   CARNIVAL was in a position of superiority and control, and had the right to exercise decisions as t the training, mode of operation, hiring, firing, supervision, and implementation of policies and procedures over COSTA CRUISE.

196.   Upon information and belief, CARNIVAL exercised its right to control, by making decisions for Defendant, COSTA CRUISE.

197.   As direct and proximate result of the ability of CARNIVAL to control its subsidiary entities, Plaintiffs have been damaged.

## COUNT IX- APPARENT AGENCY

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

198.   As described above, Defendants, CARNIVAL, allowed other Defendants, including but limited to COSTA CRUISE, to utilize the company name in such a way that prospective travelers and passengers would reasonably understand that COSTA CRUISE was acting in conjunction with the CARNIVAL brand.

199.   Further, CARNIVAL made or allowed statements to be made or published to the general public that made it reasonable for the public and plaintiffs, in particular, to believe that CARNIVAL and COSTA CRUISE are one corporate empire, with CARNIVAL as the parent corporation to its subsidiary, COSTA CRUISE.

200.    At all times material, COSTA CRUISE was acting within the scope of its apparent authority as of the date of the *Costa Concordia* cruise on or about January 13, 2012.

201.    Plaintiffs relied on the apparent agency relationship between Defendants.

202.    As direct and proximate result of the apparent agency, Plaintiffs have been damaged.

## COUNT X(A)- FRAUDULENT INDUCEMENT

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

203.    Defendants offer and provide cruise vacations to consumers both within the State of Florida, throughout the United States and abroad.

204.    Defendants advertise and accept cruise bookings via its internet web site at www.costacruise.com which is administered in the State of Florida.

205.    Defendants engage in the practice of 'clickwrap' agreements on their Costa Cruise website.

206.    A 'clickwrap' agreement is an online contract whereby the consumer has to click "I accept" the terms and conditions of the contract in order to complete the transaction.

207.    To purchase tickets for the *Costa Concordia* cruise the Plaintiffs had to click "I accept" the terms and conditions of the contract.

208.    The webpage where the purchaser had to click "I accept" did not contain the complete terms and conditions of the contract, and did not contain notice of the forum to bring a court action, or the limitations on recovery for damages.

209.   The "I accept" webpage contained only the following language regarding recovery of damages and forum which stated:

> **Additional Limitations of Liability**
> **The Passage Ticket Contract contains further limitations of liability, In the event of any conflict between these terms and conditions and those contained in the Passage Ticket Contract, the Passage Ticket Contract will control. Under the Terms and Conditions of the Passage Ticket Contract, the liability of Costa Crociere, CCL and other parties to Guests is limited for personal injury, death, damage to or theft of luggage or personal property, delay, and other events whether occurring on board the cruise ship or elsewhere. In addition, your right to recover in a legal proceeding will be based upon the applicable law and forum stated in the Passage Ticket Contract. Guests should read the Passage Ticket Contract online at costacruises.com or request a copy by calling 1-800-GO-COSTA.**
> **Note: Once again, we call your attention to the passage tickets and vouchers issued for this cruise program which contain further limitations of liability.  If you have any questions about them, please call your travel agent or 1-800-GO-COSTA.**

210.   Following the directions of the Additional Limitations of Liability paragraph to read the ticket contract online at www.costacruises.com yield no results because the Passenger Ticket Contract cannot be found at that location, and one would have to call the number and request the ticket contract.

211.   Meanwhile, in order to complete the transaction and buy the ticket, one must click "I accept"; therefore the purchaser must purchase the ticket before given access to the Passenger Ticket Contract.

212.   The true terms and conditions of the Passenger Ticket Contract are material facts.

213.   The omission of the terms in conditions of the Passenger Ticket was a false statement of material facts.

214.    Defendants knew or should have known of the falsity of the statements and intended that the false statements induce another's reliance; to wit, to purchase of the ticket without knowledge of the terms and conditions.

215.    Plaintiffs justifiably relied on the false statements to their detriment. When the ticket is received, any attempt to cancel the contract would be subject to the following terms:

> *Cancellation:*
> *Notice of cancellations and requests for refund must be submitted in writing to: Costa Cruise Lines Inc, 200 South Park Road, Suite 200, Hollywood, FL 33021-8541. Cancellations may not be made by email. All documents (deposit receipt or passage tickets) issued by CCL must be returned before a refund can be processed. Cancellation charges, per person, will be assessed based on when cancellation notices are received as follows:*
>
> *Non-Caribbean:*
> *90 or more days prior to sailing: Full Refund*
> *89 - 57 days prior to sailing: Deposit Amount (plus $50 fee for air cancellation)*
> *56 - 30 days prior to sailing: 50 percent of cruise fare/air add-on/hotel*
> *29 - 15 days prior to sailing: 75 percent of cruise fare/air add-on/hotel*
> *14 days or less prior to sailing: No refund (100 percent cancellation charge)*

216.    Furthermore, Plaintiffs could have in no way imagined or predicted that the terms of the ticket could in any way limit their right of redress for a shipwreck disaster caused by the gross negligence of Defendants.

## COUNT X(B) - VICARIOUS LIABILITY OF CONDUCT RELATED TO FRAUDULENT INDUCEMENT

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

217.    Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

## COUNT XI(A) - UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### Fla. Stat. § 501.201, et seq.

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in the above paragraphs as fully stated herein and further allege:

218.    At the time of booking, Defendants represented on their webpage only portions of the *Terms and Conditions* of the cruise passage.

219.    This representation caused the Plaintiffs to book their vacation on the *Costa Concordia*.

220.    At the time of embarking the *Costa Concordia*, the  Defendants presented the Plaintiffs with new and different terms from to those purportedly offered to them when they booked their vacation online.  Plaintiffs could not reject these terms.

221.    By failing to reasonably communicate the terms of the purported agreement to the WARRICKS, in a way that denied the WARRICKS an opportunity to examine its contents, Defendant Cruise Lines have acted unconscionably, unfairly and deceptively in conducting trade or commerce in violation of the FDUTPA.

222.    As a result of the Defendants said unfair and/or deceptive trade practices, Plaintiffs were injured.

## COUNT XI(B) - VICARIOUS LIABILITY OF CONDUCT RELATED FUDTPA

Plaintiffs, BRANDON WARRICK, AMANDA WARRICK, and ADRIAN WARRICK adopt and re-allege all allegations contained in paragraphs above as fully stated herein and further allege:

223.    Defendants, CARNIVAL and CARNIVAL PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE.  Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL PLC.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiffs, WILHELMINA WARRICK, CIELITO WARRICK, ADRIAN WARRICK, AMANDA WARRICK, and BRANDON WARRICK pray this Court enter an order against Defendants for the following relief:

1. Declare all limitations of any kind whatsoever for the *Costa Concordia* Passenger Ticket Contract null and void based on the following:

   a. Defendants' acts and omissions, including but not limited to, deliberately steering the ship too close to shore causing it to strike Le Scole Reef, refusing to alert passengers and conduct a timely evacuation, abandoning ship, and withholding information about what was transpiring on the ship from the Italian Coast Guard, actions that directly contributed to the deaths of 32 people and the ensuing terror for those who survived, were willful, wanton, and demonstrated extreme reckless disregard for the care and safety of others as to render the passenger ticket void;

   b. Defendants knowingly obtained Plaintiffs' agreement of the Passenger Ticket Contract by fraudulent misrepresentation.

2. Judgment against Defendants, jointly and severally, as follows:

   a. economic and compensatory damages;

   b. punitive damages, as the Defendants' actions were intentional, deliberate, and so willful and wanton and reckless as to demonstrate a conscious disregard of the rights of others;

c.  pre-judgment and post-judgment interest;

d.  reasonable attorneys' and experts' fees and other costs Plaintiffs have incurred in uncovering, proving, and applying for relief; and

e.  any other remedies prescribed by law or such relief that this Court may deep just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Signed this **13th day of July, 2012.**

Respectfully submitted,
*Counsel for Plaintiffs*

By:  \_\_\_\_*/s/ Gabrielle Lyn D'Alemberte*\_\_\_\_
Gabrielle Lyn D'Alemberte, Esq.
Florida Bar No.: 169722
THE D'ALEMBERTE TRIAL FIRM
1749 NE Miami Ct
Unit 301
Miami, FL 33132
Telephone: 305/343-5304
Facsimile: 305/397-1199
Email: gabrielle@dalemberte.com

By:  \_\_\_\_*/s/ Reginald J. Clyne*_____
Reginald J. Clyne, Esq.
Florida Bar No. 654302
CLYNE & ASSOCIATES, P.A.
814 Ponce de Leon Boulevard,
Suite 210
Coral Gables, Florida 33134
Tel: (305) 446-3244
Fax: (305) 446-3538
Email: rjc@clynelegal.com